IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SARAH SHARP,[1] | § | |
| | § | |
| Respondent Below, | § | No. 375, 2023 |
| Appellant, | § | |
| | § | Court Below: Family Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | Case No. 2304002630 |
| Appellee. | § | |

Submitted: October 16, 2024
Decided: December 16, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, **GRIFFITHS**, Justices, constituting the Court *en Banc*.

**<u>ORDER</u>**

After consideration of the briefing by the parties, and following oral argument, it appears to the Court that:

(1)    Sharp, a teenager on probation, was seen by police with part of a handgun sticking out of his pocket. After Sharp returned home, probation officers entered the house, handcuffed Sharp and another juvenile, and started to search the house without first contacting a parent or guardian. They found a handgun and magazines. The State filed a Juvenile Petition for Delinquency. The Family Court

---

[1] The Court previously assigned pseudonyms to the parties under Supreme Court Rule 7(d).

denied a motion to suppress evidence found during the search. After trial, the court adjudicated Sharp delinquent for possessing and concealing a deadly weapon.

(2)     Sharp argues on appeal that the handgun should not have been admitted into evidence because probation officers failed to comply with a Youth Rehabilitation Services' ("YRS") policy governing administrative searches of a child probationer's home. We agree and vacate the Family Court's delinquency adjudication.

## Facts

(3)     On April 5, 2023, Detective Donald Witte of the New Castle County Police Department's Safe Streets Task Force was conducting surveillance at Collins Park for an unrelated investigation.[2] He noticed two teenagers about 200 feet away playing basketball in front of a house.[3] A black SUV, moving at a "pretty fast" speed towards the teenagers, attracted Detective Witte's interest.[4] When the SUV's back door opened, Detective Witte saw one of the teenagers, later identified as Sharp, "contacting" someone inside.[5] Through binoculars, Detective Witte saw Sharp step away from the SUV with an extended magazine sticking out of his sweatpants pocket.[6] The magazine appeared to be connected to a firearm inside the pocket.[7]

---

[2] App. to Appellant's Opening Br. at 108, 111 [hereinafter "A__"].
[3] A111–13.
[4] A113; A122.
[5] A113; A122.
[6] A49; A122.
[7] A113.

Detective Witte also observed that the object "pulled down [Sharp's sweatpants] so far that the pocket was down near his knee."[8] Detective Witte was "100% confident" that Sharp was carrying an extended magazine attached to a firearm.[9]

(4)     Detective Witte reported what he saw to Senior Juvenile Probation and Parole Officer Shane Russell, a specialized YRS probation officer.[10] SJO Russell knew Sharp was on probation and living at a nearby house.[11] SJO Russell contacted Supervisor Deanna Carnevale to authorize an administrative search of Sharp's residence.[12] SJO Russell relayed what Detective Witte had told him – that Sharp had entered the house with a firearm.[13] Supervisor Carnevale authorized an administrative search of Sharp's residence.[14] SJO Russell and other law enforcement officers arrived at Sharp's residence about fifteen minutes after Detective Witte's initial contact with him.[15]

(5)     Detective Witte, SJO Russell, and other law enforcement officers approached the house.[16] Sharp answered and said his mother was not home.[17] Sharp

---

[8] A113–14.
[9] A114.
[10] Id.
[11] Id.
[12] A134. Supervisor Deanna Carnevale oversaw the Serious Juvenile Offender Unit of the Department of Services for Children, Youth, and their Families. A129–30.
[13] A134–35.
[14] A141–42.
[15] A116.
[16] A117–19.
[17] A118; A123.

3

was taken into custody and put in handcuffs.[18] Detective Witte entered the house and went into the kitchen.[19] He saw that the refrigerator door was open.[20] A second teenager emerged from the basement.[21] Detective Witte believed that the second teenager "left the refrigerator door open and ran downstairs really quickly to get rid of something. . . ."[22] Detective Witte handcuffed the second teenager.[23]

(6) While Detective Witte watched the two teenagers in the first-floor living room, SJO Russell and the other officers searched the house.[24] After starting the search, SJO Russell called Sharp's mother and grandmother separately.[25] Sharp's mother said she was at work and could not return to the house.[26] Sharp's grandmother also said she could not come to the house.[27] It is unclear whether Sharp's mother and grandmother said when they would return.[28]

(7) Detective Witte initially testified that law enforcement officers searched Sharp's bedroom and common areas, such as the living room, basement, and kitchen.[29] He later testified, however, that he "didn't see specifically what

---

[18] A118.
[19] A118–19.
[20] *Id.*
[21] A119.
[22] *Id.*
[23] *Id.*
[24] A119; A127.
[25] A49; A156.
[26] A49.
[27] *Id.*
[28] Videotape: 2024-07-24 FAMILY COURT ARGUMENT 375, 2023 *Sharp v. State*, at 24:02–08 (Del. 2024) (on file with the Delaware Supreme Court).
[29] A120.

rooms [the officers] were going into."[30]  They found a Glock-style magazine in Sharp's bedroom and a Polymer P80 9mm handgun with a Glock-style magazine in the basement.[31]

## Procedural History

(8)     The State filed a Juvenile Petition charging Sharp with possession of a firearm by a prohibited juvenile, carrying a concealed deadly weapon, and conspiracy in the second degree.[32]  Sharp moved to suppress based on an unlawful administrative search.[33]  According to Sharp, YRS did not comply with the relevant administrative search policy.[34]  Sharp also argued that the search was not justified under the emergency doctrine.[35]

(9)     The Family Court denied the motion to suppress.[36]  It reasoned that YRS substantially complied with YRS policy for administrative searches.[37]  As the court held, although a parent or guardian was not present before the search, "reasonable efforts were made to contact [Sharp's] guardians, contact was accomplished, and [Sharp's] guardians declined to return home to be present for the

---

[30] A128.
[31] A49.
[32] Answering Br. at 1.
[33] Ex. A. to App. Opening Br. at 1.
[34] *See Id.* at 7–8.
[35] *Id.* at 9.
[36] *Id.* at 10.
[37] *Id.* at 9.

search."[38]  According to the court, the administrative search policy only required substantial compliance, not perfect compliance.[39]  It was enough, the court held, that reasonable steps were taken to contact Sharp's guardians.[40]  The court also decided that the search was not justified under the emergency exception to the warrant requirement.[41]

(10)   Sharp was tried and adjudicated delinquent for possession of a firearm by a prohibited juvenile and carrying a concealed weapon.[42]  The Family Court sentenced him to 12 months at the Ferris School, with credit for time served, followed by aftercare supervision.[43]

### Arguments on Appeal

(11)   On appeal, Sharp argues that the Family Court erred by not excluding the weapon at trial.[44]  By executing an administrative search of Sharp's home without parental presence or approval, he contends, law enforcement officers violated the relevant policy and conducted an unlawful search.[45]  Sharp also argues that, by failing to produce SJO Russell at the suppression hearing, the State failed to establish that SJO Russell complied with the relevant policy and prevented his cross-

---

[38] *Id.* at 7.
[39] *Id.*
[40] *Id.* at 8.
[41] *Id.* at 9–10.
[42] Ex. B. to App. Opening Br. at 1.
[43] *Id.* at 3.
[44] Opening Br. at 2.
[45] *Id.* at 8–10.

examination for alleged factual inconsistencies between his notes and testimony by Detective Witte and Supervisor Carnevale.[46]

(12) The State responds that the firearm was the product of a valid administrative search because law enforcement officers substantially complied with the relevant policy.[47] In the alternative, the State contends that the search was justified by the emergency doctrine.[48] Finally, the State argues that the absence of SJO Russell at the suppression hearing did not prevent Sharp from cross-examining the other officers on alleged factual inconsistencies.[49] We review the denial of a motion to suppress for abuse of discretion,[50] any underlying findings of fact for clear error,[51] and the legal issues *de novo*.[52]

## Analysis

(13) The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ."[53] Article I Section 6 of the Delaware Constitution also protects "persons, houses, papers and possessions[] from

---

[46] *Id.* at 18.
[47] Answering Br. at 15.
[48] *Id.* at 22–23.
[49] *Id.* at 26–27.
[50] *Juliano v. State*, 254 A.3d 369, 376 (Del. 2020).
[51] *Anderson v. State*, 249 A.3d 785, 795 (Del. 2021).
[52] *Juliano*, 254 A.3d at 376.
[53] U.S. CONST. amend. IV.

7

unreasonable searches and seizures. . . ."[54]  Warrantless searches are *per se* unreasonable absent a recognized exception.[55]  One recognized exception is when law enforcement officers search a probationer's dwelling.[56]  For children, Section 4321(f) of the Delaware Code provides that "[s]pecialized juvenile probation and parole officers . . . may conduct searches of individuals under the supervision of the Department of Services for Children, Youth and Their Families' Division of Youth Rehabilitative Services in accordance with agency procedure. . . ."[57]

(14)   The parties agree that the 2010 YRS Policy SJO-202 ("2010 Policy") as it stood at the time of arrest is the relevant agency procedure.  It provides, in relevant part:

> 8.      If the person who has primary control of the residence is not present, the probation officer should not enter the premises. A search should be conducted in the presence of another probation officer or other law enforcement officer and a parent or guardian. If the client is over 18 and is living independently, a search can be done without a parent or guardian present.[58]

---

[54] DEL. CONST. art. I, §6.

[55] *Matthews v. State*, 319 A.3d 891, 904 (Del. 2024).

[56] *See Griffin v. Wisconsin*, 483 U.S. 868, 873–75 (1987); *see also Donald v. State*, 903 A.2d 315, 319 (Del. 2006) ("The special nature of probationary supervision justifies a departure from the usual warrant and probable cause requirements for searches. . . .").

[57] 11 *Del. C.* § 4321(f) (emphasis added).  In its answering brief, the State argues that the Conditions of Supervision form ("Conditions Form") signed by Sharp and his parent/guardian operates as a waiver of "any purported regulatory right to have the primary tenant/parent/guardian present during an administrative search."  Answer Br. at 16–17.  This argument is unpersuasive. The relevant portion of the Conditions Form provides that the State's authority to supervise a child like Sharp comes from 11 *Del C*. § 4321(f).  Thus, it must still comply with Section 4321(f) when conducting searches of child probationers.

[58] A20.

(15) Substantial compliance with the 2010 Policy satisfies Section 4321(f) and the reasonableness requirement of the United States and Delaware Constitutions.[59] The State must prove substantial compliance with the 2010 Policy.[60]

(16) Sharp's main contention on appeal is that law enforcement officers did not comply with the 2010 Policy because they failed to observe the parental contact and presence requirements before conducting the administrative search.[61] Sharp asserts that the parental notice and presence provision is required because parental involvement is "fundamental to the purpose of juvenile probation."[62] In response, the State focuses on the modal verb "should" and its permissive as opposed to mandatory meaning.[63] In other words, according to the State, the provision is advisory only.

(17) After our review of the record, we are convinced that the State did not meet its burden of proving that it complied with the 2010 Policy. We agree with the State that substantial compliance, not perfect compliance, is required with the 2010 Policy. But here, the State disregarded the 2010 Policy's parental notice and

---

[59] *Pendleton v. State*, 990 A.2d 417, 419–20 (Del. 2010).
[60] *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001) ("[O]n a motion to suppress evidence seized during a *warrantless* search, the rule in Delaware should now be clear. The State bears the burden of proof.").
[61] Opening Br. at 2.
[62] *Id.* at 11.
[63] Answering Br. at 19.

9

presence provision before starting the search because it disagreed with the 2010 Policy.

(18) As noted above, the 2010 Policy states that law enforcement officers should not enter the house or search the premises without first contacting a parent or guardian. Here, law enforcement officers did not comply with the parental notice and presence provision before they started searching Sharp's home. SJO Russell called Sharp's mother and grandmother but did so only after entering the house and starting to search rooms within the house.[64]

(19) We are reluctant to second-guess how probation officers respond to each encounter with a juvenile probationer. But here, the 2010 Policy was still in effect. The officers and their supervisor disregarded the 2010 Policy because they disagreed with it. Supervisor Carnevale testified that she was aware that law enforcement officers entered and searched the house before contacting Sharp's mother.[65] According to Supervisor Carnevale, the existing 2010 Policy was a "bad policy."[66] She believed that the parental notice and presence provision jeopardized

---

[64] A156. The Family Court found that SJO Russell contacted Sharp's mother and grandmother before searching the house. Ex. A. to App. Opening Br. at 7–8. It relied on a pre-search checklist and Supervisor Carnevale's testimony. *Id.* The pre-search checklist does not, however, address the timing of the search. And although Supervisor Carnevale initially testified that her "best guess" is that law enforcement officers attempted to contact Sharp's guardians prior to the search, she later testified that she was aware that the officers had already begun searching before attempting to contact Sharp's guardians. A142; A156.

[65] A156.

[66] *Id.*

safety.[67] And parents and guardians were refusing to appear at their house to block YRS officers from searching their residences.[68]

(20) Supervisor Carnevale testified that the 2010 Policy was amended to address those problems.[69] Nonetheless, at the time that law enforcement officers searched Sharp's home, the 2010 Policy had not been changed.[70] They were not free to ignore the 2010 Policy at the time of the search because they disagreed with it or believed it needed revision. The State therefore failed to meet its burden that it substantially complied with the 2010 Policy.

(21) We affirm the Family Court's ruling that the State failed to meet its burden to prove that an emergency existed to justify disregarding the 2010 Policy. The 2010 Policy provides that "[b]efore any search is conducted, probation officers must have the approval of a supervisor or designee, unless emergency circumstances dictate otherwise."[71] But even though, as the 2010 Policy recognizes, emergency circumstances can excuse compliance, any "emergency" ended when probation officers entered the house, handcuffed the children, and secured the house. At that point, the probation officers should have attempted to comply with the 2010 Policy

---

[67] *Id.*

[68] A143.

[69] *Id.* Supervisor Carnevale testified that, at the time of the search, the Policy was "in [the] process of being changed." A155.

[70] A154–55.

[71] A20.

11

before searching the residence.  As noted above, the search started before attempting to contact Sharp's mother or guardian.

## Conclusion

(22)  The firearm was the result of an unlawful administrative search of Sharp's house.  The handgun should have been suppressed.  Accordingly, we vacate the Family Court's adjudication of delinquency.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Chief Justice